# Third District Court of Appeal

## State of Florida

Opinion filed January 5, 2022.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D20-1033
Lower Tribunal No. 12-39036
_____

**GG Investment Realty, Inc., et al.,**
Appellants,

vs.

**South Beach Resort Development, LLC, et al.,**
Appellees.


An Appeal from the Circuit Court for Miami-Dade County, William Thomas, Judge.

Michael Compagno, P.A., and Michael Compagno (North Palm Beach), for appellants.

Genovese Joblove & Battista, P.A., and Richard Sarafan and Joseph B. Isenberg, for appellees.


Before LOGUE, LINDSEY and BOKOR, JJ.

LOGUE, J.

GG Investment Realty, Inc., Gene Grabarnick, Pauline Grabarnick, and Garett Grabarnick (the "Counter-Defendants" or "Grabarnicks") appeal a final judgment in favor of South Beach Resort Development, LLC, De Soleil Management, LLC, So. Beach Hotel, LLC, and Louis Taic (the "Counter-Plaintiffs") following a bench trial. Finding competent substantial evidence to support the trial court's findings of fact and no error of law, we affirm.

**Background**

This action stems from a transaction for the acquisition of a hotel condominium in Miami Beach. The background facts are summarized from the evidence presented at the bench trial.

Around 2001, real estate investors Gene Grabarnick and Ronald Molko formed South Beach Resort Development, LLC (the "Company") for the purpose of developing a luxury hotel condominium on Collins Avenue (the "Project"). Molko and Gene served as managing members. The ownership in the Company was shared among Molko (50%), Gene and his wife Pauline (37.5%), and their son Garett (12.5%). Gene would exercise the voting rights on behalf of Pauline and Garett. To kickstart their project, the Company obtained a $29 million construction loan. As a condition of the loan, the bank required the formation of South Beach Resort Management, LLC ("SBRM"), to act as manager of the Company. To that end, the Company's ownership

2

was modified by reducing a 0.5% interest from each of Gene's and Molko's respective interests so that SBRM obtained the remaining 1% interest.

The real estate partners also formed De Soleil Management, LLC ("DSM") to operate and manage the Project. The ownership in DSM was the same as that in the Company before the formation of SBRM. Additionally, GG Investment Realty, Inc., was incorporated as the exclusive real estate broker for the sale of the condo units at the Project. GG Investment was owned exclusively by Garett who sold 67 of the 80 units and was owed about $550,000 in commissions through GG Investment.

Then came the 2008 financial crisis. The Company fell behind on its payments and the loan went into default with a $17.8 million balance. After entering a forbearance agreement to evade foreclosure, Gene and Molko (hereinafter the "Sellers") began looking for potential buyers to sell their respective interests in the Project. Louis Taic and Michael Fischer, another real estate duo from New York, became the ultimate buyers through their entity, So. Beach Hotel LLC ("SBH" or "Buyer"), and proceeded to conduct their due diligence while negotiations were taking place.

According to the Buyer's accountants, the books and records of the Company and DSM were lacking and inadequate such that a proper due diligence was unfeasible. The Sellers decided to provide a balance sheet

that would be attached to the separate Purchase and Sale Agreements for the Grabarnicks' interest and Molko's interest. That balance sheet, prepared as of June 30, 2008, listed the supposed assets and liabilities of the Company. Relevant here, under "Other Assets" were two accounts receivables totaling approximately $3.1 million from SBRM, the entity that owned a 1% interest in the Company and was created for the sole purpose of acquiring the loan. As would later be discovered when the Company's 2007 federal income tax return was filed in early 2009, its total assets in the federal return substantially differed from the Sellers' representations in the 2008 balance sheet. The Company's tax return did not reflect those assets and indeed, showed negative equity contrary to the 2008 balance sheet.

On September 29, 2008, the deal was finalized. SBH acquired all of Molko's 50% membership interest and one-third of the Grabarnicks' combined 50% membership interest.[1] The Purchase and Sale Agreements included a paragraph titled, "Additional Representations and Warranties"

---

[1] In exchange for its portion of the Grabarnicks' interest, SBH paid (a) $200,000 to the Sellers' counsel for the transaction and for prior legal fees; (b) up to $1,400,000 to satisfy outstanding liens and accounts payable; and (c) $3,470,000 of the existing construction loan on the Project. In exchange for Molko's entire 50% membership interest, SBH (a) paid Molko $300,000 at closing; (b) executed a $1,000,000 promissory note in favor of Molko; and (c) had the Company execute a $700,000 promissory note in favor of Molko. Additionally, two promissory notes were executed for GG Investment's unpaid commissions totaling $500,000.

4

which provided, in relevant part, that each "Seller represents that the balance sheet for [the Company] attached hereto as Exhibit 'J' is true and correct in all material respects." After closing the transaction, SBH held a two-thirds membership interest in the Company and DSM and became the managing member of both entities. The Grabarnicks held a one-third minority interest.

As a result of the change in ownership, SBH and the Grabarnicks entered into an Amended Operating Agreement for the Company. Under paragraph 10(a) of this Agreement, SBH, as managing member, could demand, in its reasonable discretion, additional capital contributions from each member. If a member failed to make the required capital call, the Agreement provided that "the other Members shall make the Additional Capital Contribution which the 'Non-Contributing Members' failed to make and to treat the Additional Capital Contributions made by such members as a loan by the Contributing Members to the Non-Contributing Members." The Agreement also specified the conditions for the non-payment of such loan including dilution of the Non-Contributing Member's percentage interest under paragraph10(d) and the grant of a security interest on the Non-Contributing Member's entire percentage interest with the right to conduct a UCC sale of the security interest under subsection (e).

Between October 2008 and March 2010, pursuant to the Amended Operating Agreement, SBH made additional capital calls from each member. None of the Grabarnicks made the required contributions. As a result, SBH, the only other member, made capital contributions totaling $2 million to keep the Project afloat. The Grabarnicks were provided written notice of each capital contribution. SBH also sent the Grabarnicks a demand letter for their obligations under the Agreement regarding the missed capital calls totaling $997,287.04. The letter also requested personal guaranties for additional capital contributions if needed. The Grabarnicks were placed on notice that if payment was not received, SBH, pursuant to the Agreement, had elected to foreclose its security interest on the Grabarnicks' membership interest in the Company.

On October 3, 2012, GG Investment sued the Company and DSM to recover on the promissory notes for its unpaid commissions. On February 26, 2013, the Company and DSM, together with SBH and Taic as additional Counter-Plaintiffs, filed a six-count counterclaim in the underlying action against the Grabarnicks and Molko.[2] In response, the Grabarnicks filed their

---

[2] The Counter-Plaintiffs sued for fraudulent inducement and as an alternative remedy rescission against GG Investment, Molko, and the Grabarnicks (Counts I and II); breach of contract against Molko under his Purchase and Sale Agreement (Count III); breach of contract against the Grabarnicks

6

own counterclaim against the Company, SBH, and Taic for their actions regarding the capital calls and subsequent UCC sale of the Grabarnicks' minority interest.[3]

Following a four-day bench trial, the trial court entered final judgment for the Counter-Plaintiffs finding, among other things, that they had proved their claims for fraudulent inducement and breach of contract against the Grabarnicks.[4] In its detailed, twenty-nine-page order, the trial court made numerous findings of fact and conclusions of law as discussed in the next paragraphs.

Because the records of the Company and DSM were in such disarray, express representations and warranties were required for due diligence purposes. The Sellers knew that numerous figures on the 2008 balance sheet attached to the Purchase and Sale Agreements were not accurate despite their express warranty that the balance sheet was "true and correct in all material respects." Testimony was presented that the Buyer had to rely

---

under their Purchase and Sale Agreement and the Amended Operating Agreement (Counts IV and V); and declaratory judgment (Count VI).

[3] The Grabarnicks filed a sixteen-count counterclaim for breach of the Amended Operating Agreement, fraudulent misrepresentation, aiding and abetting fraud, civil conspiracy, negligent misrepresentation, breach of fiduciary duty, constructive fraud, conversion, and civil theft.

[4] The claims against Molko were settled and are not at issue here.

7

upon the Sellers' representations on the balance sheet regarding the financial state of the Company. The trial court found that the Sellers made fraudulent misrepresentations—in the form of the balance sheet and warranties in the purchase agreements—to induce the Buyer to purchase the failing Company, and that the Buyer relied upon such fraudulent misrepresentations to its detriment.

As for GG Investment's underlying claim to recover on the promissory notes, the trial court found that the notes issued to GG Investment for its unpaid commissions were tainted by the fraud and were unenforceable. In so ruling, the trial court concluded that GG Investment was a third-party beneficiary of the sale of the Project based on the fraudulent 2008 balance sheet. The trial court relied upon the references made to the notes in the purchase agreements as well as Garett's testimony that the notes were part of the transaction.

As for the Counter-Plaintiffs' claim for breach of the Amended Operating Agreement, the trial court found that the Grabarnicks had breached this agreement by failing to make the required capital contributions and failing to repay the loans for same made by SBH. Nevertheless, the trial court concluded that no damages were recoverable because the Counter-Plaintiffs had obtained the Grabarnicks' membership interest at the UCC

8

sale. Lastly, the trial court found in favor of the Counter-Plaintiffs on all of the Counter-Defendants' counterclaims stemming from SBH's actions regarding the capital calls and resulting UCC sale. The trial court concluded that the UCC sale of the Grabarnicks' minority membership interest was "valid and not commercially unreasonable."

Final judgment was entered by separate order awarding the Counter-Plaintiffs the sum of $6,969,494.37, inclusive of pre-judgment interest, on the fraudulent inducement claim, and $1,365,034.95 for breach of the Purchase and Sale Agreement against the Grabarnicks. This timely appeal by the Grabarnicks ensued.

**Analysis**

"We review a judgment rendered after a bench trial to ensure that the trial court's findings of fact are supported by competent, substantial evidence. Pure legal conclusions are reviewed de novo." SG 2901, LLC v. Complimenti, Inc., 323 So. 3d 804, 806 (Fla. 3d DCA 2021).

The Grabarnicks raise four issues on appeal. They assert that the trial court erred by: (1) awarding fraud damages that were not supported by competent substantial evidence and failing to adjust the award in proportion to the parties' respective membership interests and provide a setoff for Molko's settlement; (2) failing to apply provisions in the Amended Operating

9

Agreement requiring the managing member to obtain a third-party loan before making capital calls and failing to apply the dilution of interest requirements for members who failed to make the required capital calls; (3) finding Pauline and Garett engaged in the same fraud in the inducement as Gene; and (4) denying GG Investment's claims to collect on the promissory notes for its unpaid commissions. Each issue will be discussed in turn.

1)    *Damages on Fraud Claim*

The Grabarnicks first challenge the damages awarded by the trial court on the fraud claim. They assert no competent substantial evidence supports the award; the trial court failed to consider the percentage of membership interest sold by the Grabarnicks and Molko; and the trial court failed to grant a setoff to account for Molko's settlement with the Counter-Plaintiffs.

"Florida law provides for an election of remedies in fraudulent inducement cases: recission, whereby the party repudiates the transaction, or damages, whereby the party ratifies the contract." Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co., 761 So. 2d 306, 313 (Fla. 2000). "In tort actions, the measure of damages seeks to restore the victim to the position he would be in had the wrong not been committed." Ashland Oil, Inc. v. Pickard, 269 So. 2d 714, 723 (Fla. 3d DCA 1972).

Here, the Counter-Plaintiffs elected to affirm the Purchase and Sale Agreement with the Grabarnicks and recover their damages due to the difficulty in returning to the pre-transaction status quo. The trial court's damages award was based on the difference in value of the assets as represented on the 2008 balance sheet and what the evidence at trial showed regarding the accuracy of those assets as of the date of closing. Specifically, the trial court found:

> This Balance Sheet listed as assets the two accounts receivable from SBRM to [the Company], each in the amount of $1,572,622.39, for a total of $3,145,244.78 that did not exist. The Grabarnicks also misrepresented on the Balance Sheet "Other Current Assets" of "Rent Exchange" in the amount of $682,208.62 and amounts purportedly due from DSM and De Soleil Master Association of $364,317.60 for a total of $1,046,556.22. These items were not, in fact, assets.

These are the figures the trial court used to calculate the damages awarded on the fraud claim: $4,191,801. Therefore, the Grabarnicks' argument that the trial court awarded speculative damages for fraud is unconvincing.

The Grabarnicks further assert that the damages should have been calculated based on their respective membership percentage interest in the Company, and that the award should have been reduced based on Molko's settlement with Counter-Plaintiffs. These arguments are similarly unavailing. Gene and Molko were business partners with a common goal: to sell their respective membership interests in the Company and DSM. Because a

11

settlement was reached with Molko relating to his counterclaim, the trial court was only required to award damages against the Grabarnicks. If the settlement had not been reached, the Grabarnicks and Molko would have been jointly and severally liable on the fraud claim.[5] Moreover, the settlement was reached to resolve Molko's counterclaim to recover on two promissory notes that he received as part of the transaction for his membership interest. Therefore, the settlement amount is irrelevant to the damages for the fraud claim against the Grabarnicks and cannot be reduced from such award because that sum was not paid to the Counter-Plaintiffs.

2) *The Amended Operating Agreement*

The Grabarnicks next assert that the trial court erred by failing to apply the provisions in the Amended Operating Agreement regarding the capital call contributions.[6] The trial court rejected the Grabarnicks' argument that

---

[5] As an intentional tort, the common law doctrine of joint and several liability applies to the claim of fraud in the inducement. See Merrill Crossings Assocs. v. McDonald, 705 So. 2d 560, 560–61 (Fla. 1997) (applying the common law doctrine of joint and several liability to intentional torts); First Fin. USA, Inc. v. Steinger, 760 So. 2d 996, 998 (Fla. 4th DCA 2000) (noting that "[f]raud in the inducement is a recognized intentional tort").

[6] The relevant provision, which was drafted by the Sellers' counsel, provides:
>      10.   As to Additional Capital Contributions referred to in Section V of the Operating Agreement, Gene and SBH agree as follows:
>      (a)   **Additional Capital Contributions.** If, at any time or from time to time, [the] Managing Member [SBH] determines in its reasonable discretion, that the Company requires additional

12

SBH, as managing member, was required to borrow the money from a third-party lender prior to making a capital call. Instead, the trial court found that the Agreement "expressly allows" SBH to request additional capital contributions from the other members if it "does not desire to borrow such funds." Indeed, despite the seeming inconsistency under paragraph 10(a) of the Agreement, the managing member was vested with broad powers including making "any and all business and non business decisions concerning the property . . . as well as the decisions concerning [the Company]." These broad powers included the discretion to decline to seek a third-party loan given the pre-existing loan obligation and the troubled financial state of the Company.

The Grabarnicks similarly take issue with the trial court's ruling upholding the UCC sale of their minority interest in the Company. They assert that, under paragraph 10(d) of the Agreement, SBH was required to dilute their membership interest before proceeding with the UCC sale. The

funds, whether for capital improvements, to defray losses, or resulting from either party's failure to satisfy its indemnification obligations set forth in the Purchase Agreement, or otherwise for the benefit of the Company, the Managing Member shall first attempt to borrow any funds needed for such purpose from third-party lenders on commercially reasonable terms. If the Managing Member is unable or does not desire to borrow such funds, then the Managing Member shall request an Additional Capital Contribution from each Member.

13

trial court also rejected this argument by pointing to paragraph 10(e) in which each member "grants to the other Members a security interest (within the meaning of the Uniform Commercial Code in effect in the jurisdiction in which the Company is located) in the Grantor's entire Percentage Interest as security for the Grantor's obligations" under the loan. This subsection further provides that if a Non-Contributing Member defaults in repayment of the loan, the Contributing Member "shall also have the right to exercise all of the rights and remedies of secured parties" under the UCC, including the "sale of the Non-Contributing Member's Percentage Interest pursuant to Article 9" of the UCC.

We find the trial court's interpretation of these provisions in the Agreement legally sound, and that it properly concluded the UCC sale was valid and commercially reasonable.

### 3) *The Fraud Ruling regarding Pauline and Garett*

The Grabarnicks next assert that the trial court erred in finding Pauline and Garett had engaged in the same fraud as Gene. However, each of the Grabarnicks signed the Purchase and Sale Agreement (PSA) which included the balance sheet with the fraudulent misrepresentations. Moreover, the PSA specifically refers to Gene, Pauline, and Garett as "Sellers" or the "Grabarnick Group" as each was a party to that agreement. Thus, the trial

court properly found that each of the Grabarnicks were responsible for the representations and warranties made in the PSA. It was also undisputed that Gene exercised the voting rights for Pauline and Garett and, as the trial court found, there was "a long and unbroken history of Garett being represented by Gene in all [of the Company]'s affairs." Thus, there is competent substantial evidence to support the trial court's finding that each of the Grabarnicks "knew that the Balance Sheet contained material falsehoods, or, at a minimum, that they certainly should have known that their representations concerning its accuracy were false."

4)      *GG Investment's Promissory Notes*

Lastly, the Grabarnicks challenge the trial court's rejection of GG Investment's claims to recover on the promissory notes for its unpaid commissions. The trial court found that the notes were unenforceable because they were tainted by fraud. Specifically, the trial court found "the parties intended that GG Investment would benefit directly from the transaction," and the Grabarnicks' PSA "specifically referenced $500,000 payable via promissory note, to GG Investment in the section discussing the 'Purchase Price.'" The trial court also based its ruling on Garett's testimony that the notes were part of the transaction and would not have been executed but for the closing of the transaction. Accordingly, the trial court equated GG

Investment to a third-party beneficiary under the purchase agreement through which it fraudulently obtained the notes. HTP, Ltd. v. Lineas Aereas Costarricenses, S.A., 661 So. 2d 1221, 1222 (Fla. 3d DCA 1995) ("A party can successfully defend against liability on a claim by showing that he was fraudulently induced to enter into the contract or transaction upon which such liability is asserted."). We find no error in this determination.

## Conclusion

Because the trial court's "thorough final judgment, which contains factual findings based on credibility determinations derived from live testimony, is supported by competent substantial evidence," Complimenti, 323 So. 3d at 804, we affirm the final judgment in all respects.

Affirmed.